## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

IN THE MATTER OF                                    MISCELLANEOUS ACTION

JONATHAN B. ANDRY                                   NO.  15-2478
ATTORNEY-RESPONDENT

### ORDER AND REASONS

Before the Court is the Lawyer Disciplinary Committee's ("LDC") Motion to Disqualify Opposing Counsel[1] Leslie Schiff and his co-counsel, Steven Scheckman,[2] Herbert Larson, and Joseph Bruno.

This proceeding initially arose from the conduct of attorney Jonathan B. Andry and others in connection with the case captioned *In re: Oil Spill by Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, 2:10-MD-2179 ("MDL 2179"), the Deepwater Horizon multi-district litigation. The Court Supervised Settlement Program ("CSSP") was created in the MDL to supervise the payment of economic damages claims following the Deepwater Horizon oil rig disaster.[3] In connection with that program, Andry was found to have violated the canons of ethics by making improper payments to attorney Lionel Sutton and by making false statements during the investigation.[4] This ultimately led to the filing of this disciplinary proceeding against Andry.

---

[1] R. Doc. 81. Respondent filed an opposition at R. Doc. 82. The LDC filed a reply to Respondent's opposition at R. Doc. 86.
[2] The LDC does not specifically include Scheckman in its Motion to Disqualify Opposing Counsel (R. Doc. 81), however the Court assumes the LDC also wishes to disqualify Scheckman as he is Schiff's law partner and would have been privy to the same information as Schiff, Larson, and Bruno.
[3] R. Doc 1 at 2.
[4] MDL 2179, R. Doc. 14221.

## BACKGROUND

Patrick Juneau ("Juneau") was appointed by Judge Carl Barbier to be the Claims Administrator of the CSSP in MDL 2179.[5] Juneau, in that capacity, ran the Claim's Administrator's Office ("CAO"). On May 28, 2013, an anonymous whistleblower conveyed a tip to David Welker, the Director of Fraud, Waste, and Abuse at the CAO, prompting Juneau to initiate an internal investigation into potential improprieties in the CSSP.[6] On June 18, 2013, British Petroleum ("BP") hand-delivered a letter to Juneau informing him that two whistleblowers had incriminating information and documents concerning corruption at the CAO.[7] In a July 1, 2013 letter to Judge Barbier, Juneau detailed the whistleblower's allegations as "(1) Mr. Sutton had been referring claims to the Andry Law Firm in exchange for "kickbacks" from any recovery on those claims to be paid by the Program to the Andry Law Firm; (2) Some claims may have been initially filed by Mr. Sutton or Ms. Reitano and were later transferred to the Andry Law Firm; (3) Mr. Sutton had recently opened a separate checking account to place the money received from the Andry Law Firm; (4) Mr. Sutton and John Andry had been in business together in the past and continued to own a business together; (5) Mr. Sutton was writing policies within the Program that ultimately may benefit himself and his friends who are attorneys; and (6) Mr. Sutton attempted to influence a claim filed by the Andry Law Firm."[8]

According to a memorandum to his file dictated by Leslie Schiff,[9] Schiff received a call from Juneau on June 18, 2013, during which Juneau asked Schiff to investigate the

---

[5] R. Doc. 81-1 at 2; *see* Preliminary Approval Order in MDL 2179, Doc. 6418 at 34.
[6] R. Doc. 81-1 at 5.
[7] R. Doc. 81-1 at 6; The letter is Attachment A, Bates numbers Andry-0001-0004.
[8] R. Doc. 81-5 at 2. The letter is Attachment G.
[9] Schiff dictated this memorandum to his file, detailing his activities while investigating the CAO from June 18, 2013 to June 24, 2013 shortly after he disassociated himself from the project. R. Doc. 82-1 at 4. The memorandum is in the record at R. Doc. 81-4.

whistleblower's allegations on behalf of the CAO.[10] On the call, they discussed the issues raised by the whistleblower generally and made plans to meet in New Orleans the following day.[11]

On June 19, 2013, Schiff arrived in New Orleans and met Juneau at the CAO, where they discussed the matter with Michael Juneau, a CAO employee, and Steve Scheckman, Schiff's partner.[12] On June 19, 2013, around 4:00 p.m., Schiff and Juneau met with Judge Barbier and Magistrate Judge Sally Shushan to disclose the information received from the whistleblower.[13] The meeting "included a discussion of the underlying factual concerns as well as a discussion of the June 18, 2013 letter received by Mr. Juneau from BP,"[14] which had been reviewed by Schiff earlier that day. The letter contained BP Mark Holstein's request for an internal investigation of the CSSP.[15] Later in the day, on June 19, 2013, Schiff had dinner with Juneau. Juneau relayed information to Schiff regarding the preliminary report from Welker.[16] The report referenced the results of Welker's search of Lionel (Tiger) Sutton's computer email for the keywords "Andry" and "Thonn."[17] Juneau relayed to Schiff that Juneau had immediately upon receipt disclosed the contents of Welker's preliminary report[18] to Judge Barbier.[19] In his affidavit dated September 17, 2020, Schiff attests the results of the email searches for Andry and Thonn were not disclosed to him.[20]

---

[10] R. Doc. 81-4 at 1.
[11] *Id.*
[12] *Id.*
[13] *Id.*
[14] Attachment A.
[15] *Id.*
[16] The preliminary report is Attachment B, Bates numbers Andry-0014-0017.
[17] R. Doc. 81-1 at 7; The email search is Attachment C, Bates numbers Andry-0018-0069.
[18] Attachment B.
[19] R. Doc. 81-4.
[20] Attachment E, Bates number Andry-0077.

At 7:30 a.m. on June 20, 2013, Schiff and Juneau met with Judge Barbier and Magistrate Judge Shushan in Judge Barbier's chambers.[21] During the meeting, Welker's preliminary report was discussed.[22] Also, during the meeting, Magistrate Judge Shushan informed Schiff and Juneau that she had spoken with Mark Holstein from BP and made arrangements for a meeting at 2:00 p.m. that day.[23] Judge Barbier requested that Schiff and Juneau attend the meeting with Judge Shushan at which members of the Plaintiffs' Steering Committee, BP representatives, and representatives of the CAO were to be in attendance.[24]

At 9:00 a.m. on June 20, 2013, Schiff called his partner, Steve Scheckman, and asked Scheckman to join Schiff at the CAO to assist with interviews of the claims department personnel.[25] Scheckman arrived at the CAO shortly thereafter. Schiff and Scheckman then met with the claims office staff and conducted interviews of nine staff members.[26,27] Additionally, at some point after lunch, but before the scheduled 2:00 p.m. meeting, Schiff and Juneau were provided with a final report prepared by Welker dated

---

[21] R. Doc. 81-1 at 7.

[22] R. Doc. 81-4 at 1; Attachment B.

[23] R. Doc. 81-4 at 1.

[24] *Id.*

[25] *Id.*

[26] R. Doc. 81-4 at 1; Employees interviewed included David Duval, Kurt Fischer, Rebecca Foreman, Pab Lavine, Henry Mitchell, David Odom, Phillip Ollendike, Chris Reed, and Tracy Steilberg. R. Doc. 81-1 at 8.

[27] The LDC claims it has not had access to any documents or investigative notes generated by Schiff during the nine interviews. R. Doc. 81-1 at 8. Schiff states in his declaration that he has reviewed his files and they do not contain any notes pertaining to any of the nine interviews. R. Doc. 82-1 at ¶ 11. In his declaration, Schiff also notes that Scheckman searched his own file and did not find notes from the interviews. R. Doc. 82-1 at ¶ 11. Gregory Paw, a member of the Freeh Group, stated in his declaration that the reports for the witness interviews were provided to Special Master Freeh's investigative team by the CSSP, and that copies of the reports are stored in the Special Master's electronic file room. R. Doc. 81-6 at ¶ 11. Paw states the Schiff memorandum references witness interviews and that interview reports were provided to the Freeh Group by the CSSP. R. Doc. 81-6 at ¶ 11. Special Master's Exhibit 3 contains interview notes which appear to be the reports mentioned by Paw. Attachment H. Many of those interview reports do not contain the name of the person who conducted the interview. Of the interviews located by the Court, none shows Schiff or Scheckman as the interviewer. Attachment H.

June 20, 2013.[28] Schiff attended the 2:00 p.m. meeting during which he informed Judge Barbier that Juneau had requested Schiff commence an investigation into the allegations presented by the whistleblower as well as the allegations in the June 18, 2013 letter from BP.[29] Schiff further informed Judge Barbier that Schiff would return to the CAO to commence further interviews of the CAO personnel.[30] Those present at the 2:00 p.m. meeting included Eugene Fendler and Mark Holstein representing BP, Steven Herman and James Roy representing the Plaintiffs' Steering Committee, and Juneau and Michael Juneau of the CAO.[31] Keith Moskowitz of BP also participated via telephone.[32] During the meeting, Welker's final report including supporting documentation was given to all present.[33]

On June 21, 2013, Schiff returned to his home in Opelousas, Louisiana.[34] On the way there, Schiff received a call from Michael Juneau regarding BP press releases about the investigations into the CAO.[35] On the call, Schiff also learned that Sutton had submitted his written resignation from the CSSP.[36] Upon reaching his office, Schiff re-read the Welker report in more detail.[37] Later in the day, Schiff received a phone call from Juneau inquiring as to whether Schiff was willing to conduct an independent review of the claims process and procedure as well as other issues raised by Juneau and those raised

---

[28] R. Doc. 81-4 at 2; Attachment D, Bates numbers Andry-0070-0076; a lightly redacted version of Welker's Final Report can be found in MDL 2179, R. Doc. 10761-3; Attachment D-1.
[29] R. Doc. 81-4 at 2.
[30] *Id.*
[31] *Id.*
[32] *Id.*
[33] *Id.* at 2-3. Schiff states in the memorandum to his file that Welker's final report, including the "supporting documentation," were given to all present at the meeting. It is unclear what the supporting documentation was. Schiff's affidavit states that he was not given the results of Welker's email search of Sutton's computer. Attachment E.
[34] R. Doc. 81-4 at 3.
[35] *Id.*
[36] *Id.*
[37] R. Doc. 81-4 at 3; Attachment D.

by BP in its June 18, 2013 letter.[38] After conferring with his law partner and taking inventory of his availability and resources, Schiff let Juneau know he was "ready, willing, and able to undertake"[39] the project. Juneau agreed to retain Schiff and a meeting was scheduled for Monday, June 24, 2014.[40]

On June 24, 2013, Schiff and Scheckman met with Juneau to disclose to him interests their firm, and Schiff personally, had in MDL 2179.[41] Schiff represents these interests had not previously been disclosed to Juneau or Judge Barbier "in any significant detail."[42] Schiff states in his memorandum[43] and declaration[44] that only after conferring with his partner Julie White and reviewing documents did he realize he had conflicts with potential BP litigation, including the firm's representation of one claimant and his own claims based on his ownership of a share of stock in Tahiti East, Inc. (a camp in Grand Isle, Louisiana,[45]), a BP claimant.[46] Schiff disclosed these conflicts to Juneau and Michael Juneau and they all agreed the involvement would be disclosed to Judge Barbier.[47] Judge Barbier ultimately appointed Louis Freeh as Special Master in MDL 2179.[48] No further work for the CAO was performed by Schiff or Scheckman.

---

[38] R. Doc. 81-4 at 3; the letter is Attachment A.

[39] *Id.*

[40] *Id.*

[41] *Id.* at 3-4.

[42] R. Doc. 82-1 at ¶ 6; R. Doc. 81-4 at 4. The LDC contends Schiff's involvement was expressly disclosed to Judge Barbier during a meeting in chambers between Schiff, Juneau, and Judge Barbier on June 20, 2013. R. Doc. 81-1 at 9. The LDC points to Schiff's memorandum, which states that Schiff discussed investigating the CAO with Judge Barbier on June 20, 2013. However, there is no evidence Schiff disclosed any potential conflicts to Judge Barbier on June 20, 2013.

[43] R. Doc. 81-4 at 3-4.

[44] R. Doc. 82-1 at ¶ 6.

[45] *Id.*

[46] R. Doc. 81-4 at 4.

[47] *Id.*

[48] R. Doc. 82-1 at ¶ 6. Gregory Paw, in his declaration, states "Judge Barbier appointed the Special Master to, among other things, perform an independent external investigation into the facts and circumstances that led to the resignation of Lionel H. Sutton III, a former staff attorney employed by the CSSP." R. Doc 81-6 at ¶ 2.

The LDC represents it was not made aware of Schiff's involvement in the initial investigation of the CAO until August 3, 2020.[49] Schiff states in his declaration that he had not produced his memorandum to his file earlier because he had forgotten it existed until very recently, when he was reminded of it in an August 1, 2020 phone call with Scheckman.[50] In Schiff's declaration, Schiff states Scheckman reminded Schiff of the existence of the memorandum on August 1, 2020, after Scheckman accessed the Schiff, Scheckman & White Dropbox.[51] Schiff represents the entirety of the information gained from his involvement in the investigation is included in his memorandum to his file dictated shortly after his interactions with Juneau concluded in June 2013.[52] Schiff represents the first time Schiff's co-counsel, Scheckman, Larson, and Bruno, saw Schiff's memorandum was immediately before it was disclosed to the LDC on August 3, 2020.[53]

During his seven-day representation of the CAO, Schiff was given multiple documents, was included in several meetings and telephone conversations, and performed nine interviews of CAO claims department staff. With respect to various sources of information, Schiff was told about the whistleblower's allegations and either provided copies of or given access to various documents, including:

- The June 18, 2013 letter from BP to Juneau regarding the whistleblower's allegations;[54]

- The preliminary report created by David Welker[55] discussed on June 19, 2013;[56]

---

[49] R. Doc. 81-1.
[50] R. Doc. 82-1 at ¶ 10.
[51] *Id.*
[52] R. Doc. 82 at 10.
[53] *Id.*
[54] Attachment A.
[55] Attachment B.
[56] Welker's Preliminary Report discusses the results of Welker's computer search of Sutton's email for the keywords "Andry" and "Thonn," found in Attachment C. Schiff attests the contents of Attachment C were not disclosed to him. Attachment E.

- The June 21, 2013 letter from BP to Judge Barbier requesting an independent investigation of the CSSP;[57] and

- An unredacted version of Welker's seven-page final report dated June 20, 2013.[58],[59]

From June 18, 2013 to June 24, 2013, Schiff attended several meetings, including:

- A meeting on June 19, 2013 with Juneau to discuss the whistleblower's allegations;[60]

- A meeting on June 19, 2013 at 4:00 p.m. with Judge Barbier, Magistrate Judge Shushan, and Juneau in which the whistleblower's allegations and the June 18, 2013 letter from BP[61] were discussed;[62]

- A meeting on June 20, 2013 at 7:30 a.m. with Judge Barbier, Judge Shushan, and Juneau in which Welker's preliminary report was discussed;[63]

- A meeting on June 20, 2013 at 2:00 p.m. with Judge Barbier, Judge Shushan, Juneau, members of the Plaintiffs' Steering Committee, representatives from BP, and representatives from the CAO where Welker's final report dated June 20, 2013 was discussed;[64] and

- A meeting on June 24, 2013 with Juneau to discuss disclosure of Schiff's firm's and his personal conflicts with Judge Barbier.[65]

---

[57] Attachment I, Bates numbers Andry-0010-0013.

[58] Attachment D, Bates numbers Andry 0070-0076. The LDC complains the version of the seven-page report dated June 20, 2013 it received was redacted with the exception of three sentences. R. Doc. 81-1 at 9. In his declaration, Gregory Paw, a member of the Freeh Group, attests that the version of this report provided to the show cause parties was the same as the one provided to the LDC. R. Doc. 81-6 at 2. The redacted version of the report provided to the show cause parties and to the LDC is found at R. Doc. 81-6 at 8-14. Respondent notes a more lightly redacted version of Welker's final report is attached as an exhibit to a motion filed in MDL 2179 on July 16, 2013 and this version has been on the public record in MDL 2179 for over seven years. R. Doc. 82 at 11; MDL 2179, R. Doc. 10761-3; Attachment D-1. Welker's investigative report follow-up dated July 1, 2013 is attached as Exhibit F.

[59] Per Court Order (R. Doc. 83), the parties produced for review unredacted versions of the June 18, 2013 letter from BP to Juneau (Attachment A); the June 21, 2013 letter to Judge Barbier from Mark Holstein of BP (Attachment I; a lightly redacted version of this letter is on the record in MDL 2179, R. Doc. 10761-7); Welker's preliminary report (Attachment B); the search results from Welker's computer search of Sutton's email containing the key words "Andry" and "Thonn" (Attachment C); and Welker's final report (Attachment D) (a lightly redacted version of this report is on the record in MDL 2179, R. Doc. 10761-3; Attachment D-1).

[60] R. Doc. 81-4 at 1.

[61] Attachment A.

[62] R. Doc. 81-4 at 1-2.

[63] R. Doc. 81-1 at 7; Attachment B.

[64] R. Doc. 81-4 at 2; Attachment D.

[65] R. Doc. 81-4 at 3-4.

On June 20, 2013, Schiff and Scheckman interviewed nine CAO employees, including:

- David Duval;

- Kurt Fisher;

- Rebecca Foreman;

- Pab Lavine;

- Henry Mitchell;

- David Odom;

- Philip Ollendike;

- Christ Reed; and

- Tracy Steilberg.[66]

Schiff, in his attached affidavit, concedes he was provided all of the above documents during his representation of the CAO.[67] Additionally, Schiff confirms he engaged in multiple phone conversations and meetings with Juneau and others from June 18, 2013 to June 24, 2013.[68]

In response to complaints about the conduct of Andry and others in connection with the CSSP, Judge Barbier appointed Special Master Louis Freeh and The Freeh Group to investigate whether there was any misconduct within the CSSP.[69] Judge Barbier gave Special Master Freeh three mandates:

> [P]erform an independent external investigation into the facts and circumstances that led to the resignation of Lionel H. Sutton III, a former staff attorney employed by the CSSP; (2) conduct fact-finding as to any other possible ethical violations or misconduct within the CSSP; and, (3) examine and evaluate the internal

---

[66] R. Doc. 81-1 at 8.
[67] Attachment E.
[68] *See* R. Doc. 81-4.
[69] MDL 2179, R. Doc. 11287 at 18-19.

compliance program and anti-corruption controls within the CSSP, and make any necessary recommendations to design and implement additional controls, policies, procedures and practices to ensure the integrity of the CSSP.[70]

In compliance with this directive, over the following two months Special Master Freeh and his investigatory team reviewed documents, conducted over eighty interviews, and took sworn testimony from several individuals, including Andry.[71]

On September 6, 2013, Special Master Freeh produced a report ("the Freeh report") detailing Andry's actions, along with the actions of other lawyers and associated law firms.[72] Special Master Freeh found Andry made improper referral payments to Sutton and that Andry had been untruthful during the investigation.[73] Accordingly, Special Master Freeh recommended the court impose sanctions and prevent Andry from further representation of claimants in the CSSP.[74] Special Master Freeh also recommended his report be referred to the Department of Justice, the U.S. Attorney's Office for the Eastern District of Louisiana, and the State Bar of Louisiana for a determination of whether Andry violated any criminal statutes or attorney disciplinary rules.[75]

The day he received Special Master Freeh's report, Judge Barbier ordered Andry, Sutton, Christine Reitano, and Glen Lerner (the "show cause parties") to show cause why they should not be disqualified from representing or collecting fees from CSSP claimants

---

[70] *Id.*
[71] *See* MDL 2179, R. Doc. 11287 at 18-19.
[72] *Id.* at 1-93. MDL 2179, R. Doc. 11287. The Freeh report was admitted into evidence at the show cause hearing as Special Master's Exhibit 3.
[73] *Id.* at 89-94.
[74] *Id.* at 14.
[75] *Id.* at 90-91.

under the unclean hands doctrine (the "show cause hearing").[76] Judge Barbier's show cause order stated:

> IT IS FURTHER ORDERED that Lionel Sutton, Christine Reitano, Jon Andry, Glen Lerner, and any associated law firms, show cause why the Court should not adopt the following findings and recommendations of the Special Master: (a) Disallowing The Andry Law Firm's claim under the Unclean Hands Doctrine; (b) Disqualifying Attorneys Lionel Sutton, Christine Reitano, Glen Lerner, and Jon Andry, as well as any associated law firms, from representing CSSP claimants (or collecting fees from such claimants) under the Unclean Hands Doctrine.[77]

Judge Barbier held an evidentiary hearing on the show cause order on November 7, 2014.[78] The show cause parties called six witnesses and offered 39 exhibits.[79] After the hearing, Judge Barbier found Andry had violated (i) Rule 1.5(e) regarding the division of fees between lawyers who are not in the same firm; (ii) Rule 3.3 by making false statements during the course of the Special Master's investigation; (iii) Rule 8.4(a) by assisting others in the violation of the Rules of Professional Conduct; (iv) by engaging in conduct involving dishonesty, deceit, and misrepresentation; and (v) Rule 8.4(d) by causing damage to the integrity of the CSSP which was prejudicial to the administration of justice.[80] Judge Barbier ordered the Special Master to file a disciplinary complaint based on his findings as follows:

> The Special Master shall report this matter to the appropriate disciplinary authorities in Louisiana and in Nevada. Additionally, the Special Master shall file a report or complaint to the Chief Judge of the Eastern District of Louisiana and the court's disciplinary committee. In connection with such reports, the Special Master shall furnish the entire record in this matter, including the Special Master's report, documentary evidence, the official transcript of the evidentiary hearing and any other evidence adduced at said hearing, and a copy of this Order imposing sanctions.[81]

---

[76] MDL 2179, R. Doc. 11288.
[77] *Id.* at 3.
[78] The transcript is in the record of MDL 2179 at R. Doc. 13675.
[79] MDL 2179, R. Doc. 13689, Exhibit List for show cause hearing.
[80] MDL 2179, R. Doc. 14221 at 4.
[81] MDL 2179, R. Doc. 14221.

Freeh transmitted a disciplinary complaint against Andry to the en banc court of the Eastern District of Louisiana on April 10, 2015, which was filed on the record on July 8, 2015.[82] This is the proceeding now before this Court. Schiff and Scheckman filed a response to the complaint on behalf of Andry, dated June 15, 2015 and filed into the record on July 9, 2015.[83]

On February 26, 2015, Judge Barbier directed the Special Master's Report and all related documents, which already were in the possession of Andry and his attorneys by virtue of the show cause hearing, be provided to the LDC.[84] Specifically, Special Master's Exhibit 3, containing the thousands of documents Special Master Freeh relied on in creating his report,[85] was ordered to be provided to the LDC. It is clear the LDC was in possession of and had reviewed at least some of these documents introduced at the show cause hearing by September 30, 2019, because on that date the LDC filed a motion in limine in this action seeking to preadmit the Freeh Report and the sixteen exhibits listed below, all of which were introduced into evidence at the show cause hearing, including Special Master's Exhibit 3:

- Special Master's Exhibit 1 – Chart identifying significant events between March 5 to March 12, 2013;

- Special Master's Exhibit 2 – Chart identifying significant events between March 15 to March 16, 2013;

- Special Master's Exhibit 3 – Special Master's Report *with thumb drive* containing footnotes to the Special Master's Report, and specifically the documents contained on the referenced thumb drive and bates stamped labeled SM-01-JA00001-00616; SM-02-JA00001-00621; SM-02-JA000706-882; and SM-03-JA000001-001317;

---

[82] R. Doc. 1.
[83] R. Doc. 4.
[84] MDL 2179, R. Doc. 14221.
[85] MDL 2179 R. Doc. 11287.

- Special Master's Exhibit 8 – May 8, 2012 letter to Christine Reitano from Andry Lerner, LLC regarding attorney referral agreement;

- Special Master's Exhibit 10 – October 19, 2012 settlement accounting from Andry Lerner, LLC regarding Casey Thonn;

- Special Master's Exhibit 23 – March 7, 2013 email from Rebecca Foreman to Jennifer Goodwin regards claims of Witco Supply, Talen Marine, Andry Law Firm, Premium Catering, and Dod L. Equipment;

- Lerner Exhibit 2 – Lionel Sutton CAO data-base access log;

- Lerner Exhibit 5 – Update on review of Code of Conduct and claims processing issues;

- Lerner Exhibit 7 – Declaration of Juneau;

- Lerner Exhibit 8 – Declaration of Jeffrey Cahill;

- Lerner Exhibit 13 – Affidavit of James Bagwell;

- Lerner Exhibit 14 – Summary of Sutton access of CAO database for each claimant;

- Lerner Exhibit 15 – Claims for Andry clients for whom Sutton accessed the CAO data-base at least once;

- Andry Exhibit 1 – Text/email of September 17, 2012 between Christine Reitano and Matt Lundy regarding expedited claims;

- Andry Exhibit 2 – Email of June 4, 2013 between Catherine Torres and Lionel Sutton regarding Sher Garner claim;

- Andry Law Firm Exhibit 8 – Emails between Lionel Sutton, III and Glen Lerner.[86]

---

[86] R. Doc. 40-1, at 7; R. Doc. 45, at 4–5.

Importantly, most if not all of the information the LDC complains Schiff learned as a result of his representation of the CAO for one week in 2013, which it says disqualifies him from representing Andry in this proceeding, was provided to Andry and his attorneys in November 2014, prior to the show cause hearing,[87] and was provided to the LDC in 2015 when the disciplinary proceeding commenced. Included among the thousands of documents in Special Master's Exhibit 3, stored on the thumb drive provided to Andry in 2014 and the LDC in 2015, are:

David Welker's unredacted Investigative Report Follow-Up dated July 1, 2013;[88]

Juneau's unredacted July 1, 2013 letter to Judge Barbier;[89] and

Interview notes of numerous CAO employees, including Tracy Steilberg.[90]

Notably, the July 1, 2013 letter from Juneau to Judge Barbier provided a detailed description of Schiff's involvement in the investigation of the CAO:

> After reviewing the June 18 letter, I immediately contacted Leslie Schiff, a Louisiana attorney specializing in legal ethics. I reported to him the current status of events and assessed his availability to perform an investigation of the matter.
>
> On the morning of June 19, 2013, I suspended Mr. Sutton and Ms. Reitano from all activities associated with the Program pending the outcome of the internal investigation. On that same morning, Mr. Schiff along and his partner Steve Scheckman came to our office and began investigating the matter by conducting interviews and reviewing pertinent documents.
>
> On the afternoon of June 19, 2013, I, along with Mr. Schiff, met with Your Honor and Magistrate Judge Shushan in chambers to discuss the allegations and report on the ongoing investigation.
>
> At 6:25 p.m. on June 19, Mr. Welker reported the results of his search of emails on Mr. Sutton's computer containing the key words "Andry" and "Thonn,"

---

[87] The LDC concedes this occurred. R. Doc. 40-1 at 2.

[88] MDL 2179, R. Doc. 12172-9 at 4-11; Attachment F.

[89] Attachment G, Bates number SM-03-JA000805 – SM-03-JA000810.

[90] Attachment H, Bates numbers SM-02-AL00406 – SM-02-AL00410; SM-03-AL000031 – SM-03-AL000038; SM-03-AL000733 – SM-03-AL000743; SM-03-AL001307 – SM-03-AL001312. Included in Attachment H are the interview notes the Court located in Special Master's Exhibit 3. The Court's search was not exhaustive.

the name of the claimant that had formerly been represented by the Sutton Reitano law firm. Recognizing that the emails may support some of the allegations of the confidential informant, I immediately contacted Your Honor that evening to request an additional meeting with the Court, which was arranged for the following morning.

The next morning, June 20, I met with Your Honor, presented the emails that had been discussed during the investigation and suggested that the Parties be advised. At 2:00 p.m. that same day, BP, the CAO, and the PSC met with Your Honor in chambers to discuss the allegations, the findings to date, and future steps in the investigation. I provided everyone with a copy of the preliminary investigative report prepared by Mr. Welker outlining the internal investigations and findings to date. At the meeting, BP suggested, as it had in its June 18 letter to the CAO, that there should be an independent investigation conducted by a person or firm with no interest in the Program. According to my recollection, Your Honor acknowledged that you thought that the CAO had already started that process by contacting Mr. Schiff, but that the parties should meet and make a recommendation with regard to an independent investigation.

* * *

On June 24, Mr. Schiff informed me that he might have a conflict of interest that would prohibit him from further working on this matter because of property that he owned in Grand Isle. I called Your Honor to relate this development, and I concurred with the Court's intent to appoint an independent third-party investigator of its choosing.[91]

Two of the documents provided to Schiff in 2013 have been on the public record in

MDL 2179 since July 16, 2013:

A lightly redacted version of the June 21, 2013 letter from BP to Judge Barbier requesting an independent investigation of the CSSP;[92]

A lightly redacted version of Welker's seven-page final report dated June 20, 2013;[93]

It is quite possible a search of the other documents attached to Special Master's Exhibit 3

would reveal BP's June 18, 2013 letter to Juneau[94] and David Welker's preliminary

---

[91] Attachment G.
[92] R. Doc. 86-1.  Also found in MDL 2179 at R. Doc. 10761-7.
[93] MDL 2179 at R. Doc. 10761-3; Attachment D-1.
[94] Attachment A.

report[95] also are included. The Court does not have the resources and does not consider it necessary to conduct further searches for these documents in Special Master's Exhibit 3, as it is clear to the Court by the time of the show cause hearing in November 2014 Andry had access to virtually everything Schiff received in 2013 and much more. What also is clear to the Court is the LDC also had possession of the documents produced to the show cause parties, including the July 1, 2013 letter[96] from Juneau to Judge Barbier disclosing Schiff's involvement, between February and July 2015. The LDC had access to a lightly redacted version of Welker's June 20, 2013 report[97] and a lightly redacted version of BP's June 21, 2013 letter to Judge Barbier[98] by July 16, 2013. The LDC either knew or should have known of Schiff's representation of the CAO by July 2015 or a short time thereafter.

## LAW AND ANALYSIS

"Motions to disqualify are substantive motions affecting the rights of the parties and are determined by applying standards developed under federal law."[99] "As such, and because disqualification of an attorney is a harsh and disruptive remedy, the party seeking disqualification bears the burden of proving a conflict of interest requiring disqualification.[100] Motions to disqualify in the Fifth Circuit are governed by state and national ethical standards.[101] In determining disqualification, at least four ethical canons are relevant: (1) the Local Rules for the Eastern District of Louisiana ("Local Rules"); (2) the American Bar Association's Model Rules of Professional Conduct ("Model Rules"); (3)

---

[95] Attachment B.
[96] Attachment G.
[97] MDL 2179, R. Doc. 10761-3.
[98] MDL 2179, R. Doc. 10761-7.
[99] *In re American Airlines, Inc.,* 972 F.2d 605, 610 (5th Cir. 1992), *cert. denied,* 507 U.S. 912, 113 S.Ct. 1262, 122 L.Ed.2d 659 (1993); *Sumpter v. Hungerford,* 2013 WL 2181296 at *5 (E.D. La. May 20, 2013).
[100] *United States v. Decay et al,* 406 F. Supp. 2d 679, 683 (E.D. La. 2005) (citing *F.D.I.C. v. U.S. Fire Ins. Co.,* 50 F.3d 1304, 1316 (5th Cir. 1995)).
[101] *In re Am. Airlines, Inc.,* 972 F.2d 605, 610 (5th Cir. 1992).

the ABA's Model Code of Professional Conduct ("Model Code"); and (4) the Louisiana Rules of Professional Conduct ("Louisiana Rules").[102] The local rules "are the most immediate source of guidance for the district court."[103] The Local Rules for the Eastern District of Louisiana incorporate the Rules of Professional Conduct for the Louisiana State Bar (the "Louisiana Rules").[104] However, "[t]he rule of disqualification is not mechanically applied in this circuit."[105] "All the facts particular to a case must be considered, in the context of the relevant ethical criteria and with meticulous deference to the litigant's rights."[106]

In considering a motion to disqualify, in addition to the formal rules, the court views the rules in light of the litigant's rights and public interest considering "whether a conflict has (1) the appearance of impropriety in general, or (2) a possibility that a specific impropriety will occur, and (3) the likelihood of public suspicion from the impropriety outweighs any social interests which will be served by the lawyer's continued participation in the case."[107]

## I.    Louisiana Rule of Professional Conduct Rule 1.9. Duties to Former Clients.

### A.    Rule 1.9(a)

Rule 1.9 deals with a lawyer's duties to his or her former *clients*. The LDC seeks to disqualify Schiff based on his violation of Rule 1.9(a), which provides: "A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or substantially related matter in which that person's interests are materially

---

[102] *See Horaist v. Doctor's Hosp. of Opelousas*, 255 F.3d 261, 266 (5th Cir. 2001).
[103] *F.D.I.C. v. U.S. Fire Ins. Co.*, 50 F.3d 1304, 1312 (5th Cir. 1995).
[104] LR 83.2.3.
[105] *Church of Scientology of California v. McLean*, 615 F.2d 691, 693 (5th Cir. 1980).
[106] *F.D.I.C. v. U.S. Fire Ins. Co.*, 50 F.3d 1304, 1314 (5th Cir. 1995).
[107] *Horaist v. Doctor's Hosp. of Opelousas*, 255 F.3d 261, 266 (5th Cir. 2001) (quoting

adverse to the interests of the former client unless the client gives informed consent, confirmed in writing."[108],[109]

The Fifth Circuit has promulgated the "substantial relationship" test to govern disqualifications under Rule 1.9(a) based on former representation.[110] To satisfy the substantial relationship test in such a situation, the burden is on the movant to satisfy two elements: (1) an actual attorney-client relationship between the *moving party* and the *attorney he seeks to disqualify*; and (2) a substantial relationship between the subject matter of the former and present representations.[111]

The LDC argues Schiff's representation of Andry is barred by Rule 1.9(a) given Schiff's prior representation of the CAO during the investigation that ultimately culminated in this disciplinary proceeding against Andry.[112] The LDC argues Schiff chose first to represent a court-supervised program, the CAO, and then to represent Andry, an individual accused of subverting the integrity of the CAO.[113]

The Fifth Circuit requires a party "seeking to disqualify opposing counsel on the ground of a former relationship" to have "an actual attorney-client relationship between the moving party and the attorney he seeks to disqualify."[114] This is because, on a motion to disqualify based on an attorney's prior representations, "the only real party in interest"

---

[108] La. R. Prof. Conduct 1.9(a)).

[109] The LDC also seeks to disqualify Schiff's co-counsel. The plain language of Louisiana Rule of Professional Conduct 1.10 automatically disqualifies all lawyers in a law firm when one attorney in the firm is disqualified.

[110] *See In re American Airlines, Inc.*, 972 F.2d 605, 614 (5th Cir. 1992) (citing *Johnston v. Harris County Flood Control Dist.*, 869 F.2d 1565, 1569 (5th Cir. 1989)).

[111] *Id.*

[112] R. Doc. 81-1 at 13.

[113] *Id.*

[114] *In re American. Airlines, Inc.*, 972 F.2d 605, 614 (5th Cir. 1992).

is the former client. [115] The former client rule has been strictly interpreted. [116] The former client in this case, the CAO, is not a party to this proceeding and has not sought to interject an objection to Schiff's representation of Andry.

The Fifth Circuit's decision in *Yarn Processing* is illustrative. [117] In that case, the Fifth Circuit set out the general rule that courts do not disqualify an attorney on the grounds of conflict unless the former client moves for disqualification. [118] The Fifth Circuit found the *Fisher Studio* case "particularly noteworthy because the Court of Appeals in that case reversed the District Court insofar as it had disqualified attorneys from appearing against parties other than their former clients." [119]

In the *Yarn Processing* case, a former patent owner (the "Former Owner") moved to disqualify an attorney who had previously provided it legal advice concerning the patent. Before the motion was resolved, the Former Owner had been dismissed from the case, rendering the motion moot. This prompted the current patent owner (the "Current Owner") to file a motion to disqualify the same attorney. The Current Owner argued it had standing to seek disqualification since "it had a right to expect that the validity and enforceability of that patent would not be subject to attack by counsel who had represented [the Former Owner] on substantially related subject matter." [120] The Current

---

[115] *In re Yarn Processing Patent Validity Litig.*, 530 F.2d 83, 90 (5th Cir. 1976).

[116] The *In re Yarn* court identified a few "narrow exceptions" to this general rule, for cases in which "the unethical change of sides [is] manifest and glaring" or "open and obvious," thereby "confront[ing] the court with a plain duty to act." *Id.* at 88–89 (citations omitted). These exceptions do not apply in this case.

[117] *In re Yarn Processing Patent Validity Litig.*, 530 F.2d at 90.

[118] *E. F. Hutton & Co. v. Brown*, 305 F.Supp. 371, 377 (S.D.Tex.1969); *Murchison v. Kirby*, 201 F.Supp. 122 (S.D.N.Y.1961); *Davis v. Poelman*, 178 So.2d 306, 311 (La.Ct.App.1965); *Almon v. American Carloading Corp.*, 312 Ill.App. 225, 38 N.E.2d 362, 364—65 (1941), rev'd. on other grounds, 380 Ill. 524, 44 N.E.2d 592 (1942); *Ferguson v. Alexander*, 122 S.W.2d 1079, 1081 (Tex.Civ.App.1938); *Richardson v. Hamilton International Corp.*, 333 F.Supp. 1049, 1054—55 (E.D.Pa.1971), aff'd, 469 F.2d 1382 (3d Cir. 1972), cert. denied, 411 U.S. 986, 93 S.Ct. 2271, 36 L.Ed.2d 964 (1973); *Fisher Studio v. Loew's, Inc.*, 232 F.2d 199, 204 (2d Cir. 1956).

[119] *Fisher Studio,* 232 F.2d at 204.

[120] *Id.*

Owner added that, because it was involved in a joint venture with the Former Owner, the Former Owner had a financial interest in the movant's success in the case at issue. The Fifth Circuit was unconvinced. It reasoned "[t]he relationship between an attorney and his client is *personal*" and could, therefore, be invoked only by the Former Client.[121] This is because a former client may consent to the employment of the attorney by an adverse party even when the former client is involved, most likely because prior disclosures will not prejudice it in the new case.[122]

The rules regarding disqualification are based upon the presumption that confidences potentially damaging to the client have been disclosed during the former representation and that disclosure of such confidences would inhibit the frank exchange of information between attorney and client. Public perception of such a possibility would tend to undermine confidence in the legal profession and the judicial process. When the former client does not seek disqualification, these considerations do not apply. As the Fifth Circuit said in *Yarn Processing*,

> "[t]o allow an unauthorized surrogate to champion the rights of the former client would allow that surrogate to use the conflict rules for his own purposes where a genuine conflict might not really exist. It would place in the hands of the unauthorized surrogate powerful presumptions which are inappropriate in his hands. Courts do not generally examine the motives of a moving party in a disqualification motion. Once the preliminary showing is made by the former client, the motion must be granted regardless of whether the former client gains an advantage at the expense of his adversary. [*Emle Industries, Inc. v. Patentex, Inc.*, 478 F.2d 562, 574—75 (2d Cir. 1973)] We are reluctant to extend this where the party receiving such an advantage has no right of his own which is invaded."[123]

The LDC has not met the first prong of the substantial relationship test set out by the Fifth Circuit by showing that it, as the movant, had an attorney-client relationship

---

[121] *Id.* at 89–90 (emphasis added).
[122] *Id.* at 89.
[123] *In re Yarn Processing Patent Validity Litig.*, 530 F.2d at 90.

with Schiff or his co-counsel.[124] The LDC does not have standing to move for the disqualification of Schiff and his co-counsel based on a violation of Rule 9.1(a).[125]

## B.      Rule 1.9(c)

As noted above, Rule 1.9 governs a lawyer's duties to his or her former clients. The LDC is not a former client of Schiff or his co-counsel and has no standing to move to disqualify them for a violation of Rule 1.9(c). Even if the LDC had standing, Schiff and his co-counsel have not violated this rule. Rule 1.9(c) provides "A lawyer who has formerly represented a client in a matter or whose present or former firm has formerly represented a client in a matter shall not thereafter: (1) use information relating to the representation to the disadvantage of the former client except as these Rules would permit or require with respect to a client, or when the information has become generally known; or (2) reveal information relating to the representation except as these Rules would permit or require with respect to a client."[126]

The LDC argues Schiff's using information in this proceeding that he gained during his representation of the CAO is a violation of Rule 1.9(c)(1). In particular, the LDC argues Schiff learned of the identity of Tracy Steilberg, a CAO employee, through his involvement in the CAO investigation,[127] and then used that information to guide his representation of Andry, pointing to (1) Schiff's interview of Tracy Steilberg during the time he represented the CAO in 2013, and (2) a May 2020 subpoena issued by Andry to Gregory Paw requesting "any documents related to any interview of Tracy Steilberg."[128] Schiff

---

[124] *See In re American Airlines,* 972 F.2d 605 (5th Cir. 1992).
[125] The Court does not rule on whether Andry's interest is materially adverse to the interest of the CAO. The Court does note the CAO has not made an appearance in this proceeding or otherwise protested Schiff's representation of Andry, even though it is clearly aware of the fact.
[126] La. R. Prof. Conduct 1.9(c).
[127] R. Doc. 81-1 at 20-21.
[128] R. Doc. 81-1 at 21.

represents he did not remember his closing memorandum to his file,[129] including the reference to his interview of Steilberg, until August 2020, while the subpoena for information regarding Steilberg was issued by Andry in May 2020, three months earlier.[130] Respondent argues the subpoena request was not based on information Schiff learned in 2013,[131] and notes identical subpoena requests were sent to eleven other individuals.[132]

The exception found in Rule 1.9(c)(1) for the use of information that is generally known is applicable in this case. Any information Schiff learned about Tracy Steilberg during his representation of the CAO has since become generally known in MDL 2179, specifically through the show cause hearing on whether individuals including Andry should be prohibited from participating in the CSSP.[133] The attachments to Special Master's Exhibit 3, provided to the show cause parties in 2013 and to the LDC in 2014, included extensive interview notes of CAO employee Steilberg.[134] Even if Schiff had not interviewed Steilberg in 2013, he would have learned of her identity and her previous work for Sutton by reviewing the documents introduced in the show cause hearing. Steilberg's employment by the CAO was generally known.

The LDC also points to information Schiff received while he represented the CAO that it believes is likely beneficial to Andry, such as Welker's follow-up report dated July 1, 2013.[135] The LDC argues Schiff had unfettered access to this report in June 2013 but the

---

[129] R. Doc. 81-4.
[130] R. Doc. 82 at 11-12.
[131] R. Doc. 82 at 12.
[132] R. Doc. 82 at 11-12. Respondent does not clarify whether these requests were made to CAO employees.
[133] *See*, MDL 2179. For example, lightly redacted versions of the June 21 letter (R. Doc. 86-1) and Welker's Final Report (Attachment D-1) both of which are on the public record.
[134] Attachment H. Some of the Steilberg interview notes were authored by the Freeh Group. The remainder were authored by Juneau, Michael Juneau, and Welker.
[135] MDL 2179, R. Doc. 12172-9 at 4-11; Attachment F.

LDC has had only access to a completely redacted version of the same report.[136] Respondent points out that a lightly redacted version of Welker's final report was filed on the public record in MDL 2179 on July 16, 2013,[137] and the unredacted follow-up report was filed on the record in MDL 2179 on January 17, 2014.[138]  Respondent also points to BP's June 21, 2013 letter to Judge Barbier which was filed on the record in MDL 2179 on July 16, 2013 in lightly redacted form.[139] The information the LDC complains Schiff learned as a result of his representation of the CAO which disqualifies him from representing Andry in this proceeding was provided to Andry and his attorneys in November 2014 prior to the show cause hearing and was provided to the LDC in July 2015 when the disciplinary proceeding commenced. Specifically, the information is included in Special Master's Exhibit 3 provided to Andry in 2014, and the LDC in 2015. This information was generally known.

The exception for information that has become generally known applies in this case. Even if the LDC had standing to move for the disqualification of Schiff and his co-counsel, the LDC has not met its burden of proving that they violated Rule 1.9(c).

## II.   Louisiana Rule of Professional Conduct 1.11(a). Special Conflicts of Interest for Former and Current Government Officers and Employees.

The LDC claims Schiff has violated Rule 1.11(a) because Schiff is a current government officer or employee. Even if the LDC had standing to seek disqualification based on a violation of this rule, this argument would fail. Rule 1.11 provides "[e]xcept as law may otherwise expressly permit, a lawyer who has formerly served as a public officer or employee of the government: (1) is subject to Rule 1.9(c); and (2) shall not otherwise

---

[136] R. Doc. 81-1 at 8-9.
[137] MDL 2179, R. Doc. 10761-3.
[138] MDL 2179, R. Doc. 12172-9 at 4-11; Attachment F.
[139] MDL 2179, R. Doc.10761-7.

represent a client in connect with a matter in which the lawyer participated personally and substantially as a public officer or employee, unless the appropriate government agency gives its informed consent, confirmed in writing, to the representation."[140]  The LDC argues Schiff "formerly served as a public ... employee of the government" and is thus precluded from representing Andry.[141] The LDC argues that, because Schiff did not have consent of the appropriate government agency, he violated Rule 1.9(c), which disqualifies him under 1.11(a).

The cases in which Rule 1.11(a) has been found to have been violated typically involve an assistant district attorney,[142] district attorney,[143] former prosecutor,[144] or law firm in which a former district attorney is employed.[145] There is no evidence Schiff is a former or current public officer or government employee. Accordingly, Rule 1.11(a) is not applicable in this case.

### III. Louisiana Rule of Professional Conduct 1.12(a). Former Judge, Arbitrator, Mediator or Other Third-Party Neutral.

The LDC claims Schiff has violated Rule 1.12. Even if the LDC had standing to seek disqualification based on a violation of this rule, this argument would fail. Under Rule 1.12(a), "a lawyer shall not represent anyone in connection with a matter in which the lawyer participated personally and substantially as a judge or other adjudicative officer or law clerk to such a person or as an arbitrator, mediator or other third-party neutral, unless all parties to the proceeding give informed consent, confirmed in writing."[146] The LDC

---

[140] La. R. Prof. Conduct 1.11(a).
[141] R. Doc. 81-1 at 21.
[142] *In re Smith*, Sup. 29 So.3d 1232 (La. March 5, 2010).
[143] *Plaquemines Parish Com'n Council v. Delta Development Co., Inc.*, 688 So.2d 169 (La. App. 4th Cir. Jan. 29, 1997).
[144] *State v. Clausen*, 104 So.3d 410 (La. Dec. 14, 2014).
[145] *Id.*
[146] La. R. Prof. Conduct 1.12(a).

argues Schiff should be disqualified under Rule 1.12(a) because he was a third-party neutral who "participated personally and substantially."[147] Louisiana Rule of Professional Conduct 2.4 defines being a third-party neutral as " assist[ing] two or more persons who are not clients of the lawyer to reach a resolution of a dispute or other matter that has arisen between them."[148] Rule 2.4 further provides, "[s]ervice as a third-party neutral may include service as an arbitrator, a mediator or in such other capacity as will enable the lawyer to assist the parties to resolve the matter."[149] LDC argues Schiff is a third-party neutral because he was engaged by the CAO "to perform an investigation of the [whistleblower's allegations]."[150]  Schiff was not a third-party neutral. His role in representing the CAO was not to assist two or more persons who were not his clients to reach a resolution. Instead, Schiff was retained by Juneau to represent the CAO by performing an investigation of the CSSP. Because Schiff does not qualify as a third-party neutral, Rule 1.12(a) is not applicable in this case.

## IV.    Louisiana Rule of Professional Conduct 8.4(d). Misconduct.

The LDC argues Schiff and his co-counsel should be disqualified because their conduct is prejudicial to the administration of justice. Rule 8.4(d) provides "[i]t is professional misconduct for a lawyer to: (d) Engage in conduct that is prejudicial to the administration of justice." The "[p]roscription against conduct that is prejudicial to the administration of justice is most often applied to litigation-related misconduct; however, it also reaches the conduct that is uncivil, undignified, or unprofessional, regardless of whether it is directly connected to a legal proceeding."[151] The LDC argues that, even if the

---

[147] R. Doc. 81-1 at 12-13.
[148] La. R. Prof. Conduct 2.4.
[149] *Id.*
[150] Attachment G; R. Doc. 81-5.
[151] *In re Downing*, 930 So.2d 897 (La. 2006).

Court were to determine the rules have not been violated or are not applicable in this context, Rule 8.4(d) disqualifies Schiff and his co-counsel because their participation is prejudicial to the administration of justice.

The LDC points to cases in which violations of Rule 8.4(d) have been found in circumstances involving an attempt to improperly influence the outcome of a judicial proceeding by seeking an unfair advantage that is prejudicial to the administration of justice.[152] For example, the Fifth Circuit has held that two attorneys violated Rule 8.4(d) by hiring a close friend of the presiding judge as co-counsel in an attempt to force the judge to recuse because "[t]o tolerate such gamesmanship would tarnish the concept of impartial justice."[153]

The Court finds the participation in this proceeding of Schiff and his co-counsel is not prejudicial to the administration of justice. The LDC has not met its burden of showing Andry was given any significant benefit by Schiff's representation of the CAO. Andry has not sought, or obtained, an unfair or unjust advantage in this proceeding by virtue of Schiff's representation of the CAO. Schiff and his co-counsel did not have access to substantial information not otherwise available to Andry in the show cause hearing and to the LDC in this disciplinary proceeding. Schiff and his co-counsel have not conducted themselves in an uncivil, undignified, or unprofessional manner. Schiff and his co-

---

[152] *See*, e.g., *In re Mole*, 822 F.3d 798, 805-06 (5th Cir. 2016) (the hiring of an attorney to motivate the recusal of presiding judge violated 8.4(d)); *see also In re Nelson*, 2020-0140 (La. 5/1/20), 295 So. 3d 922 (frivolous motions to recuse judges violated 8.4(d)); *In re Bandaries*, 2014-1435 (La. 12/9/14), 156 So. 3d 1152, 1160-61 (attorney filing a frivolous and duplicative litigation violated 8.4(d)); In re Nelson, 2013-2699 (La. 5/7/14), 146 So. 3d 176 (causing a mistrial by removing jurors from a jury panel based exclusively on race violated 8.4(d)); *In re Downing*, 2005-1554 (La. 5/17/06), 930 So. 2d 897, 903 (obtaining civil and arrest warrants in an *ex parte* and improper manner violated 8.4(d)).
[153] *In re Mole*, 822 F.3d 798, 805-06 (5th Cir. 2016) (quoting *McCuin v. Tex. Power & Light Co.*, 714 F.2d 1255, 1265 (5th Cir. 1983)).

counsel's participation in this proceeding is not prejudicial to the administration of justice.

## V.    Appearance of Impropriety.

Even if the LDC does not have standing to seek disqualification of Schiff, and the rules cited by the LDC have not been violated, the Court must consider whether "the likelihood of public suspicion from the impropriety outweighs any social interests which will be served by the lawyer's continued participation in the case."[154] "A court must take into account not only the various ethical precepts adopted by the profession but also the social interests at stake."[155] To do so, a court will consider whether a conflict "(1) has the appearance of impropriety in general; or (2) a possibility that a specific impropriety will occur; or (3) the likelihood of public suspicion from the impropriety outweighs any social interests which will be served by the lawyer's continued participation in the case."[156]

The Fifth Circuit has held "disqualification based on appearance of impropriety is unjustified without at least reasonable possibility that some identifiable impropriety actually occurred."[157] Further, "[a] disqualification inquiry, particularly when instigated by an opponent, presents a palpable risk of unfairly denying a party the counsel of his choosing. Therefore, notwithstanding the fundamental importance of safeguarding popular confidence in the integrity of the legal system, attorney disqualification … is a sanction that must not be imposed cavalierly."[158]

---

[154] *Sumpter v. Hungerford*, 2013 WL 2181296 at *5 (E.D. La. May 20, 2013) (citing *In re Dress Industries*, 972 F.2d 540, 543-44 (5th Cir. 1992)).
[155] *F.D.I.C. v. U.S. Fire Ins. Co.*, 50 F.3d 1304, 1316 (5th Cir. 1995).
[156] *Waste Management of Louisiana, LLC v. River Birch, Inc.*, 2015 WL 1415097 at *4 (E.D. La. March 27, 2015) (quoting *In re Dress Industries, Inc.*, 972 F.2d 540, 544 (5th Cir. 1992)).
[157] *F.D.I.C. v. U.S. Fire Ins. Co.*, 50 F.3d 1304, 1316 (5th Cir. 1995).
[158] *Id.*

In this case, the LDC fails to establish a reasonable probability that any actual impropriety occurred as a result of Schiff's representation of the CAO for one week in 2013 and his representation of Andry in this proceeding. The societal interest of choosing one's council weighs heavily in the Court's decision. The Supreme Court has acknowledged an order disqualifying counsel "may impose significant hardships on litigants."[159] Further, the Fifth Circuit has noted, "the more frequently a litigant is delayed or otherwise disadvantaged by the unnecessary disqualification of his lawyer under the appearance of impropriety doctrine, the greater the likelihood of public suspicion of both the bar and the judiciary."[160]

In this case, Andry has retained Schiff and Scheckman since July 2015, during more than five years of expensive and time-consuming litigation.[161] The LDC knew or should have known at or near the time Schiff enrolled in this proceeding that he had represented the CAO in 2013. Yet, the LDC did not file a motion to disqualify Schiff and his co-counsel until August 7, 2020, five years later.[162] Andry's hearing on the disciplinary charges pending against him currently is scheduled for December 14, 2020.[163] Substantial hardship would be imposed on Andry if Schiff and his co-counsel were disqualified two months prior to his hearing. The majority of information Schiff gained while representing the CAO later became generally known in connection with the MDL 2179 show cause hearing in November 2014. Schiff did not gain any significant amount of beneficial

---

[159] *Richardson-Merrell, Inc. v. Koller*, 472 U.S. 424, 440 (1985).
[160] *F.D.I.C. v. United States Fire Ins. Co.*, 50 F.3d 1304, 1316 (5th Cir. 1995).
[161] R. Doc. 3. Larson enrolled on December 18, 2018. R. Doc. 23. Bruno enrolled on July 16, 2020. R. Doc. 74.
[162] R. Doc. 81.
[163] R. Doc. 80.

information as a result of his representation of the CAO that would not have been available to him in connection with the show cause order.

The Court finds any appearance of impropriety based on Schiff's week-long representation of the CAO seven years ago is outweighed by the societal interest in Andry's exercise of his right to counsel of his own choosing, particularly given the timing of the motion to disqualify.

## CONCLUSION

The LDC does not have standing to move for the disqualification of Leslie Schiff and his co-counsel based on his alleged violation of the Louisiana Rules of Professional Conduct 1.9(a), 1.9(c) and 8.4(d). Even if the LDC had standing to move to disqualify Schiff and his co-counsel, the exception in Rule 1.9(c) applies because any information Schiff obtained during his representation of the CAO has become generally known. The conduct of Schiff and his co-counsel is not prejudicial to the administration of justice under Rule 8.4(d). Louisiana Rules of Professional Conduct 1.11(a) and 1.12(a) are not applicable to the facts of this case.

Any appearance of impropriety created by Schiff's week-long representation of the CAO in 2013 is outweighed by the societal benefit of preserving Andry's right to choose his own counsel in this proceeding.

Accordingly, **IT IS ORDERED** that the Lawyer Disciplinary Committee's Motion to Disqualify Opposing Counsel is **DENIED**.

New Orleans, Louisiana, this 8th day of October, 2020.

**SUSIE MORGAN**
**UNITED STATES DISTRICT JUDGE**